5-12-0248, and Mr. Whenever you're ready, Mr. Roth.  Please the court. It is, I'd just like to say, a great pleasure to be back here after about 10 years. The last time I was here, Gordon Mang was sitting in your chair, and my law school class was not represented on the court, and that's a terrible oversight, and I'm glad that that's been recognized. It's less of a pleasure to be here as the appellant, and it's always not a pleasure to be the appellant when the only applicable standard of review is whether the trial court abused its discretion. But we do believe that happened in this case, and I've always found the abuse of discretion standard and stating it and understanding it to be somewhat elusive. But I do believe here that we can demonstrate that the result of the trial court's rulings, granting the contested motion in limine, and in denying the defendant the opportunity, or in denying the defendant's motion to set it aside because the plaintiff had opened the door to such testimony, I think it results in, I believe, a manifest injustice because it gave the plaintiff, I don't know what else to say, other than it gave the plaintiff everything. It gave the plaintiff her cake and let her eat it too. It gave her a $576,000 verdict. And I think it's the direct result of the court's ruling on the motion in limine and then refusing to vacate that ruling once the cross-examination of the plaintiff had established it could. Well, the evidence you wanted to introduce was generally back problems, is that right? Yes. And the plaintiff claimed problems to her coccyx region, and it does appear that pretty much the plaintiff kept the evidence to complaints about that region. And the plaintiff did until we got to cross-examination, and let me explain exactly what happened here. And I think first we have the motion in limine, and the motion in limine was, I believe, premised on the assumption that the low back is not the coccyx. It's not the area of the buttocks, or as my esteemed adversary used the term, gluteal region, and probably a better term than I would have come up with under the same circumstances. But he, the motion that was filed by the plaintiff, sought to exclude any, essentially, any reference to prior low back problems because the complaints don't have to do with the low back. Well, that's fine because we developed a defense that was premised on the plaintiff not making any complaints about the coccyx until two and a half months after the accident. Now, if you go back and see Dr. Puri's testimony and Dr. Roth's testimony, I've never had a Dr. Roth before. It got rather confusing. But when you look at their testimony, and Dr. Puri is a little stronger about this. Dr. Puri is kind of, Dr. Puri is stronger. Dr. Roth is not so certain. She's a GP. But their statement was, well, if you have coccygenia as a result of the accident, and let's just define that. Coccygenia is an inflammation of the tissues around the coccyx. If you have coccygenia as a result of the accident, you're going to have symptoms right away. Well, in this particular case, and this is really interesting because the plaintiff testified on direct examination, page 180 of the record. Question, prior to June 3rd, that's the day of the accident, had you ever experienced pain or symptoms in the tailbone coccyx area? No, never. Since June 3rd, 2005, since this collision with the truck, have you continually experienced symptoms? Yes, I have. Well, that's fine. Because that seems to limit it and narrow it, as I think counsel was trying to do. The problem, of course, is that when plaintiff goes to the emergency room on June 3rd, 2005, she doesn't say anything about the coccyx. She doesn't say anything about the gluteal region. She says, well, I have pain in my low back. So we ask her, you developed low back pain on June 3rd, 2005. This is page 220 of the record, correct? This is in your cross-examination. This is in my cross-examination. In other words, the plaintiff didn't develop that as a low back pain. The plaintiff asked about coccyx. I'm talking about your opening the door argument. The plaintiff asked only about the coccyx. But the plaintiff asked, since June 3rd, 2005, have you continually experienced? And so clearly the testimony is she began experiencing pain, coccygeal pain, on June 3rd, 2005. In the cross-examination, we established that the plaintiff had said, I have low back pain, to the doctors, and then it goes on. She said, it started down in the buttocks area and worked its way up. Question, you used the term lower back to describe that.  And that's because you described, you think of the buttocks as the lower back, as part of it is. So now we have a situation where, and I thank you for the question, because you really brought it to the nub of the case. And this is a very simple and very direct case, I think. We now have a situation where the plaintiff has succeeded in excluding testimony about prior complaints of a low back. And now she says, but I had coccygeal pain from the time of the accident. That's the nub of the case. Because if the jury believes that the plaintiff had coccygeal pain from the time of the accident, even my own expert will probably concede that it's, and I think they conceded at one point, that it's possible, at least, that the plaintiff sustained coccygemia in the accident. Did you preserve an offer of proof in that regard? Yes. You made an offer of proof that would have connected all of that? Yes. The offer of proof was made, actually, the judge, Lachine, ruled that all of the excluded testimony from the defendants, from the physicians, would be accepted as an offer of proof of what they would testify to. And did that include the causation issue under Voykin? There's certainly questions about causation under Voykin. Did you ever offer any evidence under the rule of Voykin? I assume you agree with Voykin that you have to have some expert who will tie the injury to causation? I can't. Well, the Supreme Court says so. So my question is, did you produce an expert who would have made that connection, causal? There's cross-examination of the physicians. And the physicians have said, but the cross-examination of the physicians dealt with whether low back pain, or what is said to be low back pain, might also be causing some of the symptoms that the plaintiff is complaining of, subsequently, that were diagnosed as coccygemia. But the primary thrust of our expert testimony was that there is no evidence of coccygemia from June 3, 2005, to late August of 2005, and because of that delay, it is medically impermissible, I guess I would say, to recognize improper, to recognize the accident as a cause of plaintiff's coccygemia. But my direct question is, you had an expert who said that to a reasonable degree of medical certainty? Yes. And that was part of your motion in limiting, your response to the motion in limiting? Yes. That's my recall. If I'm understanding your question correctly. And even after you think they opened the door, then you renewed the objection and put that in as an offer of proof? The offer of proof was made before the door was opened. And we asked that the excluded testimony, when we made the claim that the door was open, we asked that the excluded testimony be put into evidence. And the court denied that motion. We also asked to vacate the motion in limiting so that we could inquire the plaintiff concerning her prior complaints and whether, for example, on March 28, 2005, which is about two months before this accident, two months and a week, whether when she said low back to her doctor on that occasion, whether she meant the buttocks as well. It's a question I certainly would have liked to have asked, but I was precluded from asking that by the ruling on the motion in limiting. Now, I'd like to go back, if I might. I think that we all assumed, Mr. Shubert assumed, I assumed, the judge assumed, the doctors have assumed, that when the term low back is used, we mean the low back, and we don't mean another part of the body. Essentially, that's the premise of Mr. Shubert's motion in limiting. You might argue that it's well taken. I don't, but it's certainly a much closer question than whether we should have been allowed to reopen, which I think is clear. The plaintiff's testimony, when she says, I think of the buttocks as part of the low back, the plaintiff then told the jury, I started having, in effect, because this is about the day of the accident, I started having pain in the coccyx, or in the general area of the coccyx, at the time of the accident. That cuts the legs out from under the defense. At the same time, the defense, because the motion in limiting is still in effect, is unable to go back and say to the plaintiff, but you've made complaints about the low back pain in the past, did you mean the buttocks at that time? And you've made complaints about low back pain after the accident, did you mean the buttocks then? And if the defense has allowed that, to ask that question, to be blunt, I don't think we really care what the answer is. Because on the one hand, the answer is, well, if the plaintiff would have answered, well, before the accident, when I said low back, I meant low back, and after the accident, I meant the buttocks, I'll go with that, and I'll argue the credibility of the witness. And I think that kind of, I think it's clear, I shouldn't say I think, it is clear that that kind of answer would certainly have undercut the credibility of the witness. On the other hand, if she says, well, yes, I had pain in the buttocks then, too, I'll go with that as well. Now, we might have had some expert problems, but that's because there was no previous evidence that the plaintiff, when she said low back, had meant buttocks, and in fact, the assumption, the underlying assumption of everyone, the judge, me, Mr. Shiver, Mr. Shuver, and the doctors, was that the low back's the low back. Mr. Roth, you're not claiming she wasn't injured in the low back, are you? I mean, I'm trying to focus on the prejudice that the defendant was suffering here. My expert gave a report in which he said that she had a brief aggravation of prior low back problems as a result of the accident. And it's your claim you weren't allowed to prove that? That was excluded. You weren't able to prove at all the aggravation? Well, I wasn't allowed to get into the prior problem. But you were allowed to talk about an aggravation, weren't you? If you can't prove the prior problem, you can't prove the aggravation. At least I don't see how. Okay. So there was no, maybe I misread the brief, there's no discussion about aggravation of the late prior injury? For the back, I'm not talking about the coccyx. No. I don't recall any. Well, the reason the trial judge didn't allow that is because you didn't have any expert testimony to link up any prior back problem with the injury presented at trial. Which the injury presented at trial by the plaintiff was strictly an injury to the coccyx. Correct. Correct. That's the reason we weren't, that's the reason the motion in limine was granted originally. But of course, no one knew that the plaintiff meant the buttocks when she said the low back. And that's what I believe changes everything. And it prevented the defense, certainly, from making its argument that the plaintiff did not develop coccygenia for two and a half months. But keeping the motion in limine, in effect, prevented the defense from then turning around and showing it may have preexisted. Which we certainly should have been allowed to do. Thank you. Thank you, Mr. Roth. Mr. Shuver? Good morning, Your Honor. May I please report, counsel? My name is Mark Shuver. I represent the plaintiff, L.E. Brendan Noble. There were four experts who testified in this case. Two treating physicians, well-qualified, Dr. Roth and Dr. Pereira, who is the director of pain management at St. Louis University. And then there were two experts retained by the defendants, an orthopedic surgeon, Dr. Anderson, and a biomechanical engineer, Louis Draganich. All four, all four were unanimous in the opinion that the injuries to the gluteal area, the coccyx, the piriformis muscle, the sacroiliac SI joint, did not preexist the June 3, 2005, motor vehicle accident. Unequivocal, all four, in that opinion. The only person who has made that claim or wants to make that claim is defense counsel, and there is simply no expert opinion to support that. All of the expert opinion is contrary to what the defendant is trying to do in this particular case. The same thing goes with the old, ununited anterior fracture of the superior end plate of L3 that showed up in an MRI post-accident. All of these medical records were in the possession of Mr. Draganich and also Dr. Anderson, had been in their possession for at least a year prior to trial. They had every opportunity to express an opinion regarding any of the prior medical records for this ununited fracture up in the lumbar spine, and they didn't. They offered no opinions on those particular issues, or they offered, with respect to the preexisting, they offered opinions that there was no connection, none whatsoever. Mr. Roth, when I asked him that question, indicated that he did have evidence connected. I beg to differ, Your Honor. I don't recall that. If Mr. Roth can find it, I certainly will correct myself. But I recall very specifically that motions eliminated were filed well in advance of trial because we anticipated this issue. The trial court allowed extensive briefing on the issue. We had one hearing. Mr. Roth was then granted additional time to elicit whatever other evidence that he could find, go back to his experts and question them, present some additional opinions. He did not do so. One of the last people who testified in this case was Dr. Anderson. And Dr. Anderson offered, there was no offer of proof. He testified live at trial. He had every opportunity. All of this evidence was already in the record. If counsel wanted to make an offer of proof at that point in time to finally put that opinion in front of us, I probably would have objected that it was late, but at least it would have been on the record. But he was silent on that. And I don't know why. It seems to me that Dr. Anderson would stick to his opinion that there was no prior evidence, no evidence that any prior history is connected to this particular injury. This is a complex injury. This is not the type of injury that lay jurors would understand. Do you think the lay juror could spell the word coccyx? I don't think so, Your Honor. In fact, Judge Sheen had a difficult time with that term. We had to correct him a couple of times very respectfully. Mr. Roth and I had difficult times with those terms. Piriformis muscle, the same thing. We had a very large color diagram of that region of the body that was used extensively by the experts so that way it could be explained to the jury. It's just not something they would understand. And to say that an injury to the upper back or to some other remote part of the body could cause an injury to a very specific area in this particular case is just beyond the ken of any lay juror. It just is. And there is no opinion whatsoever tying any of this. The only opinion is that it is not tied to this. I want to just briefly address this issue of the history following the motor vehicle accident. The history is very consistent with an onset immediately following the accident. In the emergency room, there's a pain diagram that was prepared. And that pain diagram shows a big swath. It was all colored in all across the buttocks region on that pain diagram. And Ms. Noble's testimony was consistent with that at trial. It was consistent with that during her discovery deposition. It has been consistent with that from day one throughout all of this. The accident happened on a Friday. That Monday, the very next Monday, she's in with Dr. Roth, and he knows that she's complaining of pain in the SI joint region. That is the region that we're talking about. A key objective piece of evidence in this case is the X-ray that Dr. Kahn finally orders of this particular part of the body. And the key there is it found this disruption of the sacrococcygeal joint, the disc between the coccyx and the sacroiliac. That is an objective piece of evidence that did not exist in any films of that region prior to the accident. It is a piece of objective evidence showing a very traumatic injury consistent with the injury that Ms. Noble sustained in this particular case. And her history throughout, after she sees Dr. Roth on the following Monday, he sends her to physical therapy. The physical therapy records are replete with pain when sitting, pain in the buttocks. What defense counsel is apparently arguing is that when Ms. Noble went to see these various medical care providers, she didn't say, I'm experiencing pain in my coccyx, I'm experiencing pain in my piriformis muscle, or I'm experiencing pain in my sacroiliac joint. She didn't know those terms. She thought those were the low back. The bottom line is they are. And the doctors who treated her before this motor vehicle accident knew the difference between those parts of the anatomy and the low back. In fact, they knew the difference between those parts of the anatomy and the upper reaches of the back. As Dr. Feinberg, which is some of the medical records that defense counsel is claiming should have been admitted, she only treated the neck and the shoulders. What relationship that has to the gluteal area is unexplained. Dr. Meinders, chiropractor, his report clearly indicates his treatment was primarily to the upper back and the neck region. And he does make a reference that he did some treatment, I think he used the word some treatment, to the low back. But you can review, he's very specific in his notations. He even identifies specific levels of the vertebra that he treated. And there's no level down in the coccyx region. If he had been treating that area, I think Dr. Meinders would have been smart enough to at least have referenced the tailbone or S1, S2, whatever those regions are. And it's just not there. And then Dr. Roth, who has been her treating physician since 1998, intimately familiar with Ms. Noble's medical history. Intimately? Intimately. Very familiar. Testified that there was no prior history whatsoever. The standard of review in this case is clear abuse of discretion. Without expert testimony, this case falls squarely in the area of Voightkin, which guards against exactly what is being done or is being attempted to be done in this case. There is no clear abuse of discretion. There is no abuse of discretion, period. The trial court had a responsibility to keep this type of evidence out. It did the proper thing in this particular case, and we would ask that this court affirm the trial court's decision. Thank you for your time. Thank you, sir. Any rebuttal, Mr. Roth? Thank you, Your Honor. Mr. Shriver's right. None of the experts said the plaintiff's coxygenia preexisted the accident. But then, of course, the plaintiff was always talking about the low back before the accident, just as she talked about the low back on the day of the accident in the emergency room. There's talk about a pain diagram that people are scribbling, and how can you tell anything? You ask somebody, where do you hurt? She says, well, in the low back. But the pain diagram did show the buttocks? Yes. So what you are wanting to do is allow the jurors to conclude that the low back includes the coccyx, basically. No. No. I simply want to ask the plaintiff, when she was talking about the low back before the accident, if she says on the day of the accident, when she says low back, she means the coccyx, I want to ask the plaintiff, before the accident when she talked about the low back, did she mean the coccyx? But who's going to explain all of that? How is a jury, how is a plaintiff even going to know what the coccyx is? Well, I wouldn't say coccyx, but there were words used during the testimony. Mr. Shriver asked some questions, I asked some questions. The word gluteal region was used, the word buttocks was used. We could certainly talk about that. In fact, the plaintiff's testimony was, when I say low back, I mean to include the buttocks. On March 28, 2005, two and a half months before this accident, when you saw Dr. Roth and you complained about the low back, did you mean to include the buttocks at that time? Now, at that point, it certainly becomes relevant, because she's basically changing the accepted definition. But the doctor on that date, March 28, diagnosed a back strain. That was a physician who didn't diagnose anything else related to the buttocks. That's true. So why would you ask that question? Pardon? If there is no doctor to link that, why do you get to ask that question to the plaintiff? That's what I'm trying to figure out. You don't have a doctor who's going to link it. In fact, the doctor says exactly the opposite. Because you can't have a doctor link it when you don't know the information. But if you do, the doctor does. When you don't know that the plaintiff means to include the buttocks, when she says low back, you know that. She took her discovery into account. Yes. And I understand. I mean, didn't you have an opportunity to ask her, you know, but point to the part of the body that was damaged previously and so forth? I could have asked her to point, I suppose. I could have asked her if she means buttocks when she says low back. I could have asked her if she meant knee when she said hip. I understand. I understand the point. And many things could have been done. The point is that this radically changed the presentation of the case. And when the plaintiff says after the accident, because we're not allowed to talk about it before the accident. When the plaintiff says after the accident, when I say low back pain, I mean the buttocks, you can't talk about it before. And the basis of the defense is that essentially low back means low back. If the plaintiff changes that definition, we ought to be able to talk about the low back whenever it came up. Now, all of this happened, by the way, on, was it the afternoon or the third day of the trial? It was, this happened, as I recall, it happened on Wednesday and the case ended Friday, Friday morning. So it's, you're in the middle of the case. It's virtually impossible to make the kinds of changes in the case that you could maybe to salvage the case. And I recognize that it put the trial court in a difficult position. Nonetheless, I think that the injustice in not allowing the defense to ask these questions and to go into that area, I think it's manifest. And injustice, if the result is injustice, there is an abuse of discretion. And there should be a new trial. Now, in this case, I'll certainly concede that the trial should be on the issue of damages only. Thank you, Mr. Roth. Thank you. All right, thank you both for your briefs and your arguments. We'll take this matter under advisement and issue a decision in due course.